50 CCPA

Harrison D. BRAILSFORD, Appellant,

v.

Marius Jean LAVET and Jacques Jean
Gustave Dietsch, Appellees.

Patent Appeal No. 6874.

United States Court of Customs
and Patent Appeals.

June 20. 1963.

Russell G. Pelton, New York City
(Donald P. Gillette, New York City, of
counsel), for appellant

Robert E. Burns, New York City (Ed-
win R. Hutchinson, Washington, D. C.,
of counsel), for appellees.

Before WORLEY, Chief Judge, and
RICH, MARTIN, SMITH and ALMOND,
Judges.

RICH, Judge.

This is an appeal by the senior party,
Brailsford, in patent Interference No.
88,950 from the decision of the Board
of Patent Interferences awarding prior-
ity to the junior party Lavet et al.

Brailsford is involved in the interfer-
ence on his patent No. 2,719,944 issued
October 4, 1955, on application Ser.No.
435,759, filed June 10, 1954, entitled
"Commutatorless Direct Current Motor."

Lavet et al. are involved on their appli-
cation Ser.No. 453,392, filed August 31,
1954, entitled "Clock Power-Device," and
assigned to Societe Anonyme des Etablis-
sements Leon Hatot, of Paris, France.

To facilitate an understanding of the issues presented by this appeal, we shall first discuss the Brailsford invention, a diagrammatic drawing of which appears below:

The device is a simple form of direct current motor consisting basically of three parts, a rotor, a stator, and a circuit including a transistor (two such circuits being shown) which takes the place of the commutator formerly used in d. c. motors. The stator includes two coils, a control winding and a driving winding both wound on the core structure of magnetizable material. The rotor is permanently magentized and rotates within the electromagnetic field of the core, generating an intermittent current in the control winding. These current pulses control the transistor, rendering it intermittently conductive. When conductive it acts as a switch to connect the driving winding to the power source, such as a battery. We will now explain the details shown in the diagram.

Clockwise rotation of shaft 12 and Alnico[1] disk 14 permits pole "N" of the permanently magnetized band 23 of disk 14 to pass near surface 16a. While pole "N" is closely related to surface 16a,

1. Alnico refers to certain aluminum-nickel-cobalt-iron alloys which have particular properties which we need not discuss beyond saying that they are highly desirable as permanent magnets.

lines of magnetic flux [2] pass primarily from pole "N" through portions 11a, 11b and 11c of pole piece 11 to pole "S" of magnetized band 23.[3] As pole "N" crosses air gap 21, the direction of magnetic flux in portions 11a, 11b, and 11c of pole piece 11 abruptly reverses inducing an electromotive force (emf) in the coil 30,[4] the direction of the resulting current being indicated by the arrow placed alongside this coil.[5] This current renders the transistor 34 conductive, allowing current to flow in the battery circuit 40–41–26–25 (left portion)–37–38–34–39 in the direction indicated by the arrows.[6] The flow of current through coil 25 generates a magnetic field in pole piece 10, the flux of which passes through portions 10b and 10a, gaps 18 and 17 and portion 10c of pole piece 10. The resultant effect of such a magnetic field is, as stated in appellant's specification, a "magnetization of the pole piece 10 in a direction to produce a clockwise torque on the Alnico disk 13, this torque resulting *from the cooperation of the magnetization of the pole structure with* the permanent field present due to the magnetization of the band 22 * * *." (Our emphasis.)

The torque applied to disk 13 is sufficient to rotate the assembly 13–12–14 sufficiently to allow the "N" pole of disk 14 to rotate clockwise beyond gap 20 of pole piece 11. This lattermost motion results in another reversal of flux in portion 11a of pole piece 11. In a manner similar to that already described with respect to coil 30, transistor 34, etc., current is now induced in coil 28 in a direction to render transistor 32 conductive, current therefore flows in battery circuit 40–41–26–25 (right portion)–35–36–32–39, and pole piece 10 is magnetized, resulting in an additional torque applied to disk 13 to rotate it clockwise.

It can be seen from the foregoing that (1) "There are thus two power pulses per revolution" in the above described device and (2) that these pulses will continue as long as the battery 40 supplies energy to the circuits.

Brailsford claims the above invention in a manner exemplified by claim 1 of his patent which reads as follows:

"1. A direct current electric motor comprising, in combination, a stationary electro-magnetic field structure, a permanently magnetized bar mounted for rotation within the said field structure, at least one driving winding on *a core portion of* said field structure, at least one control winding on *a core portion of* said field structure, and a circuit including a source of direct current, at least one transistor connected with

2. A magnetic field may be represented by continuous lines, called flux lines, which are considered to emerge from a north pole and enter a south pole.

3. Lines of magnetic flux (flux) always take the path of least resistance in passing from a north to a south pole. It is for this reason and, additionally, for the reason that resistance to the passage of such flux by air gaps is many times that of pole piece 11, that the flux in the above device will primarily take the *two*-air-gap route between poles "N" and "S" through the three legs of pole piece 11, rather than the shorter *three*-air-gap route between these poles which involves, in part, traveling directly from portion 11a of pole piece 11, through air gap 20 or 21, to portion 11c of pole piece 11.

4. A fundamental principle of electro-magnetic theory is that an emf is generated in a material whenever the mag-

netic flux passing therethrough undergoes a change in magnitude and/or direction.

5. The direction of the current resulting from this change in flux may be found to be as indicated in the above figure by either the "Right-hand Screw Rule" or the three-fingered right-hand rule for generators both of which find their basis in the theory known as Lenz's Law.

6. The issues of the instant appeal require us to say, with respect to transistor 34, only that it is designated by appellant as being of the "P.N.P." type. Because of the electrical properties of such a transistor, current will not flow in the above designated battery circuit in the absence of current flow in the coil 30 and wire 33 in the particular direction indicated. Thus when transistor 34 passes current, transistor 32 does not, and vice versa.

its emitter-collector terminals in series with said driving winding, and its base terminal connected to said control winding, said transistor being rendered conductive by the current induced in said control winding in response to rotation of said bar to supply current from said source to said driving winding to thus produce magnetic pulses in said field structure for rotating said rotor bar." [Emphasis ours.]

Count 1 of the instant interference is identical with claim 1, supra, except for the above emphasized limitations therein referring to "a core portion of" the field structure. The omission of these limitations is in fact the sole distinction between claims 1, 2, 3 and 12 of the Brailsford patent, copied by Lavet et al. for interference purposes, and counts 1–4 of the instant interference.

The opinion of the Board of Patent Interferences begins by setting forth the subject matter of, and the parties to, the instant interference. It then states:

"Lavet *et al.* copied claims 1, 2, 3 and 12 of the Brailsford patent in

modified form, omitting a limitation which has apparently been regarded as immaterial under the last sentence of Rule 205(a)." [7]

Lavet et al. do not consider the omitted limitations material; indeed they cannot if the instant counts are to serve as a basis for an interference between themselves and Brailsford as they have no disclosure to support the limitations. Brailsford, however, contends that such limitations are material and contends that the board erred "In holding that the counts of the interference are properly modified." The modification is "proper," of course, only where the limitation omitted is "immaterial." Under the present Patent Office Rules of Practice, the only construction we can logically place on this alleged error is that the board erred in implicitly finding an interference *in fact* between the parties.[8]

■■■ In considering the existence or non-existence of an interference *in fact* between the instant parties, the first consideration is whether the omission of the recited "core portion" from the *claims of of the Brailsford patent* [9] results in a

7. The last sentence of Rule 205(a) reads: "If claims cannot be properly presented in his application [that of an applicant copying claims from a patent] owing to the inclusion of an immaterial limitation or variation, an interference may be declared after copying the claims excluding such immaterial limitation or variation."

8. See in this regard Rule 232(a) (4) which, under the heading "Motions to dissolve," states "(a) Motions to dissolve an interference may be brought on the ground * * * (4) *that there is no interference in fact* if the interference involves * * * a patent, a claim of which has been copied in modified form." (Emphasis ours.)

9. The phrase "interference in fact" is one of art in interference practice. Its use is restricted, as indicated by Rule 232(a) (4), to interferences involving plant or design applications and patents or "*a patent, a claim of which has been copied in modified form.*" (Emphasis ours.) The distinction between "interference in fact" questions and those involving the "right to make" a count is one neces-

sary to an understanding of our decision in the instant case. In Blackmore v. Hall, 1905 C.D. 561, Commissioner Allen commented on this distinction in part as follows:

"Non-interference in fact as a ground for dissolution of interferences was placed in the rules at a time when it was customary to put parties into interference proceedings who had not made the same claims, but whose claims were considered, nevertheless, to cover substantially the same invention. In such cases the question arose whether the inventions claimed interfered, and this question was independent of the question of the right of either party to make the claims upon which he had been put into interference."

Similarly, in McCabe v. Cramblet, 65 F.2d 459, 20 CCPA 1220, this court stated (at 20 CCPA 1223, 65 F.2d at 461):

"The first question for consideration is whether there is any patentable distinction between the counts here involved and said claims 1 to 5 of appellant's patent; or, in other words, do the claims of said patent and the counts of the interference call for the same invention? If they do, it is well established that

946

different invention being claimed. We think it does.

There is no indication that Brailsford ever contemplated the use of his "driving" and "control" windings without field structure core portions being associated therewith. Our previous analysis of the Brailsford invention clearly indicates that pole pieces 10 and 11, with their respective "core" portions, are much more than mere "support" members as they apparently were considered to be by the board. Without such "core" portions, it is clear that the inducing of voltage in the Brailsford driving and control windings, while possible, could only be accomplished in a manner entirely different from that contemplated by Brailsford.

 We therefore think that the instant counts constitute *improper* modifications of claims 1, 2, 3 and 12 of the Brailsford patent. Accordingly we find no interference *in fact* between the subject matter of the counts in interference and the subject matter of the Brailsford patent claims on which the counts were based. The decision of the board, which awarded priority to Lavet et al. of "sub-

stantially the same subject matter" as that defined in claims 1, 2, 3 and 12 of Brailsford's patent, is accordingly reversed.

Reversed.

limitations in the claims of appellant's patent having no patentable significance may under certain circumstances, be ignored, and an interference based upon claims of appellant's patent is proper with such *immaterial* limitations omitted. Neither is it necessary that the exact wording of the patentable elements of the claims of appellant's patent be copied; *the test is whether the counts of the interference and the claims of the patent call for the same invention. If they do, an interference between them is proper.* In re Ellis & Holden, 47 F.(2d) 963, 18 CCPA [Patents] 1060, and cases cited." [Emphasis ours.]

The distinction between "interference in fact" and "right to make" problems, furthermore, is not merely one of semantics. As Commissioner Allen stated in the Blackmore case:

"Observation of the distinction between dissolution for non-interference in fact, on the one hand, and dissolution for lack of right to claim or non-patentability, on the other hand, is a matter of consequence and not mere technicality." Under present Patent Office practice, this

"matter of consequence" is, as discussed above, that dissolution of the instant interference for non-interference in fact will afford no ground for refusing to Lavet et al. the subject matter of the instant counts. See Rule 257(b), Patent Office Rules of Practice. See also Ex parte Whiteley et al., 76 U.S.P.Q. 69 (Pat.Off.Bd.App.).

The above considerations lead us to find that in considering the propriety of claims copied from a patent, the materiality in proposed counts of portions omitted *from such claims* must be determined *solely* by an analysis of whether such portions defined material aspects *of the patentee's invention.* While it does appear that Lavet et al. have found it unnecessary in *their* invention to use pole pieces with associated core portions to achieve apparently the same results as Brailsford, this fact alone will not justify the continuation of the instant interference merely for the purpose of determining whether Brailsford's date of invention would bar the allowance of the subject matter of the instant counts to the party Lavet et al.